# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2008

_____

| | | |
|---|---|---|
| Sidney James, on behalf of Dominic James, Deceased, and on his own behalf, | * * * * | |
| Appellant, | * * | Appeal from the United States District Court for the |
| v. | * * | Western District of Missouri. |
| Alysha Friend, Kristy Hardy, Charlene Valade, Melissa Ridenhour, | * * * | |
| Appellees. | * | |

_____

Submitted: January 12, 2006
Filed: August 10, 2006

_____

Before WOLLMAN, LAY, and ARNOLD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Sidney James (James) appeals from the district court's[1] grant of summary judgment against him. We affirm.

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

# I.

This case arises out of the death of Dominic James (Dominic), James's and Stephanie Ford's son. Dominic was taken into the custody of the Department of Family Services (DFS) on June 18, 2002, following an argument between James and Ford that drew the attention of a police officer. DFS first attempted to place Dominic with Ford's parents, but when that was unsuccessful Dominic was placed with John and Jennifer Dilley. None of the parties to this action participated in that placement decision. At the time of the events giving rise to this action occurred, the appellees were DFS employees: Alysha Friend was Dominic's case worker; Kristy Hardy was Friend's immediate supervisor; Charlene Valade was an out-of-home supervisor; and Melissa Ridenhour was a hotline operator.

Shortly after Dominic's placement with the Dilleys, James and Ford began to express concern to Friend and Hardy about injuries they had observed on Dominic's body. Friend and Hardy asked the Dilleys about injuries they had noticed on Dominic's face and body and were told that Dominic had tripped while running outside the house with the Dilleys' son and that he had run into the corner of a dresser.

On July 22, 2002, Dominic's Family Support Team (FST) met. The group included Friend, Hardy, deputy juvenile officer Autumn Masaoay, Dominic's guardian ad litem Michelle Law, Dominic's parents' attorney Sandra Baker, and Dominic's parents. Concerns were expressed regarding Dominic's injuries and his affect during visits.

On August 11, 2002, John Dilley called 911 to report that Dominic was having seizures. Dominic was found to be unresponsive and was airlifted to a hospital, where he was treated for four-and-a-half days. On August 13, one of the emergency responders called the DFS hotline to express concern about the apparent bruises that

he had observed on Dominic's back. Valade was assigned by DFS to investigate possible abuse to Dominic by the Dilleys.

Valade interviewed both Jennifer Dilley and Ford at the hospital on August 13 and conducted an examination of Dominic. Jennifer told Valade that Dominic's back bruises had resulted from his sliding up and down on his booster seat and that she and her husband had put a towel on the back of the seat to prevent any further bruising. Jennifer told Valade that the mark on Dominic's eye was the result of his running into the edge of a dresser several weeks earlier.

Valade found Jennifer Dilley's explanations of Dominic's injuries to be credible and did not observe any injuries that she considered to be signs of abuse. Valade also spoke to a number of hospital personnel. She spoke with Jennifer Dilley about scheduling a home visit and asked Dilley to call her after Dominic was released from the hospital. Valade intended to call the Dilleys on August 19 to schedule a home visit if she had not heard from Jennifer before that date.

Friend visited Dominic twice in the hospital on August 12. She spoke with hospital personnel, the Dilleys, and Dominic's parents. She was told by hospital personnel that Dominic's seizures were most likely caused by a viral infection. Friend also spoke to Valade, who indicated that she had not found any signs of abuse and would probably be "unsubstantiating" the hotline report. The doctors who examined Dominic at the hospital saw no evidence of shaken baby syndrome and observed no objective signs of physical abuse.

On August 14, 2002, a 60-day FST meeting was held to discuss Dominic's case. With the exception of Hardy, present at the meeting were all of the team members who had attended the July 22 FST meeting. Friend informed the group about the hotline report and said that the call would be "unsubstantiated." Masaoay, Law, and Baker expressed concerns about the bruising on Dominic's body and the seizure he

had experienced during his hospitalization and voiced their belief that Dominic should be placed in a different home. Although Friend initially expressed her opposition to moving Dominic, she eventually agreed that he should be moved to another foster home.

Following the August 14 FST meeting, Friend met with Hardy, who told her that in the absence of a court order, a substantiated report of abuse, or DFS suspicion of abuse, DFS policy required a two-week notice before Dominic could be placed in a new home. Dominic was subsequently released from the hospital and returned to the care of the Dilleys. Neither Friend nor Hardy told any of the other FST members that Dominic was being returned to the Dilley home.

On August 18, 2002, Dominic was rushed to the hospital, where it was determined that he had suffered abusive head trauma, subdural hemorrhage, and massive bilateral retinal hemorrhage. He died from those injuries on August 21. John Dilley was later convicted of child abuse resulting in death and of second degree assault, charges that arose out of Dominic's death.

James filed suit in federal court against the Dilleys, Friend, Hardy, Valade, and Ridenhour pursuant to 42 U.S.C. § 1983, asserting violations of the due process clause of the Fourteenth Amendment, as well as a claim under the Missouri Wrongful Death Act, Mo. Rev. Stat. § 537.080. After James settled his claims against the Dilleys, the remaining defendants moved for summary judgment. The district court granted summary judgment in favor of the defendants on all counts.

On appeal, James argues that genuine questions of material fact remain regarding his federal and state law claims against Friend and Hardy and his federal constitutional claims against Valade. James has abandoned his claims against Ridenhour and his state law claims against Valade.

## II.

We review <u>de novo</u> a district court's grant of summary judgment. <u>Aviation Charter, Inc. v. Aviation Research Group/US</u>, 416 F.3d 864, 868 (8th Cir. 2005). Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Aviation Charter</u>, 416 F.3d at 868. We view the evidence and the inferences that may reasonably be drawn from the evidence in the light most favorable to the nonmoving party. <u>Id.</u> A party opposing summary judgment must set forth sufficient evidence to permit a reasonable jury to find for him on all elements of his claims. <u>See</u> <u>Thompson v. Hubbard</u>, 257 F.3d 896, 898-99 (8th Cir. 2001).

## A.

We engage in a two-part inquiry in determining whether a section 1983 suit against public officials can proceed in the face of the officials' assertion of qualified immunity. <u>Littrell v. Franklin</u>, 388 F.3d 578, 582 (8th Cir. 2004). The threshold question is whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officials' conduct violated a constitutional right. <u>Id.</u> If we find a constitutional violation, we ask whether that right was clearly established. <u>Id.</u> Immunity will extend to the officials' actions if their conduct was objectively legally reasonable in light of the information they possessed at the time of the alleged violation. <u>Id.</u> at 583.

We turn then to the question whether the facts alleged by James establish the existence of a constitutional violation. Generally, the due process clause does not require the state to protect an individual against private violence. <u>Moore v. Briggs</u>, 381 F.3d 771, 773 (8th Cir. 2004). The state is required, however, to protect individuals who are in its custody or are subjected to a state-created danger. <u>Hart v. City of Little Rock</u>, 432 F.3d 801, 805 (8th Cir. 2005); <u>Forrester v. Bass</u>, 397 F.3d

1047, 1057-58 (8th Cir. 2005). A custodial relationship is created when a child is placed in foster care. Norfleet v. Arkansas Dept. of Human Servs., 989 F.2d 289, 293 (8th Cir. 1993).

In the context of this custodial relationship, a substantive due process violation will be found to have occurred only if the official conduct or inaction is so egregious or outrageous that it is conscience-shocking. Burton v. Richmond, 370 F.3d 723, 729 (8th Cir. 2004). When deliberation is practical, the officials' conduct will not be found to be conscience-shocking unless the officials acted with deliberate indifference. Moore, 381 F.3d at 773. Deliberate indifference will be found only if the officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and the officials actually drew that inference. Id. at 773-74. Mere negligence or even recklessness by a public official is not enough to shock the judicial conscience. S.S. v. McMullen, 225 F.3d 960, 964 (8th Cir. 2000) (en banc).

A review of appellees' conduct in this case, however arguably negligent it may now appear in the clear light of hindsight, does not reveal the existence of deliberate indifference on the part of Friend, Hardy, or Valade. James has presented evidence that shows that appellees were aware of facts from which an inference might have been drawn that a substantial risk of serious harm existed. He has not, however, presented sufficient evidence to show that any of the appellees actually drew such an inference. The only evidence presented regarding Friend's and Hardy's subjective beliefs is the fact that Friend agreed at the August 14 FST meeting to move Dominic. Even taken in the light most favorable to James, however, the record does not support an inference that Friend's acquiescence in the view that Dominic should be moved to a different foster home was motivated by any subjective belief on her part that Dominic was being abused in the Dilley home. Likewise, Friend's statements at the FST meeting constitute no evidence of Hardy's subjective state of mind. Finally,

James does not even argue that Valade actually drew an inference of a substantial risk of serious harm.

The most that can be said about Friend, Hardy, or Valade based on this record is that they were insufficiently skeptical about the Dilleys' explanations for Dominic's injuries. Their willingness to accept those explanations does not rise to the level of a substantive due process violation. See Forrester, 397 F.3d at 1059 (finding no conscience shocking behavior when investigator believed statements that appeared in hindsight to be false).

James alternatively argues that Friend and Hardy acted intentionally to harm James by allowing Dominic to be returned to the Dilleys without notifying the FST. James argues that this was "conduct intended to injure in some way unjustifiable by any government interest [which] is the sort of official action most likely to rise to the conscience-shocking level." County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998). James has not presented evidence that Friend and Hardy acted with any malicious intent, nor has he explained why their actions were not justified by their observance of the state's procedures regarding the administration of the foster care system.

In sum, then, because the facts alleged, taken in the light most favorable to James, do not show that Friend's, Hardy's, or Valade's conduct violated Dominic's or James's substantive due process rights, the district court properly granted summary judgment on these claims.

**B.**

Friend and Hardy assert the defense of official immunity in response to James' state law wrongful death claim. Under Missouri law, the doctrine of official immunity protects public officials from civil liability for injuries arising out of their

discretionary acts or omissions performed in the exercise of their official duties. Hawkins v. Holloway, 316 F.3d 777, 788 (8th Cir. 2003). Official immunity does not, however, shield officials for liability arising from their negligent performance of ministerial acts or functions. Harris v. Munoz, 43 S.W.3d 384, 387 (Mo. Ct. App. 2001). To determine whether a function is discretionary or ministerial, we must conduct a case-by-case determination, weighing "such factors as the nature of the official's duties, the extent to which the acts involve policymaking or the exercise of professional expertise and judgment." Charron v. Thompson, 939 S.W.2d 885, 886 (Mo. 1996). A ministerial act is one that is required to be performed in a prescribed manner, upon a given set of facts, in obedience to the mandate of legal authority, without regard to the official's own judgment. Id. Discretionary acts, on the other hand, involve an official's exercise of reason in developing a means to an end and the employment of judgment to determine how or whether an act should be performed or a course pursued. Hawkins, 316 F.3d at 789.

James argues that the DFS policy manual, which requires FST members "[t]o keep all team members informed of significant changes in status of the case or individual team members," imposed a ministerial duty on Friend and Hardy to notify the rest of the FST that Dominic would not be placed in a different home following the August 14 FST meeting. James asserts that it was the failure to perform this ministerial act that resulted in Dominic's death.

The policy identified by James, however, requires the exercise of a significant amount of discretion by public officials. Friend and Hardy, in complying with the policy, were required to determinate whether a change in status had occurred and whether that change was significant enough to impose upon them a duty to notify the other team members. Moreover, even for significant changes, the policy requires the team members to exercise judgment regarding the urgency of notification. The policy does not require the notification of each day-to-day detail that could be construed as a change, nor does it require immediate notification of all team members.

Accordingly, Friend and Hardy's decision not to notify the team members that Dominic would not be immediately removed from the Dilleys' care constituted a discretionary act protected by official immunity, and thus the district court properly granted summary judgment in favor of Friend and Hardy on this claim.

The judgment is affirmed.

LAY, Circuit Judge, dissenting.

I respectfully dissent. I would agree that summary judgment is proper on James' constitutional claims against Hardy and Valade, and on James' pendent state law claims against Friend and Hardy.[2] However, the record contains sufficient evidence that DFS social services worker Alysha Friend acted with deliberate indifference by failing to remove Dominic from the Dilleys' care, thus exposing her to liability under § 1983. Specifically, there is evidence that Friend actually drew the inference that the Dilleys posed a substantial risk of serious harm to Dominic. When dealing with constitutional claims involving deliberate indifference, plaintiffs rarely possess direct evidence that the state official actually "drew the inference" and, in these instances, this fact may be inferred through circumstantial evidence. Spruce v. Sargent, 149 F.3d 783, 786 (8th Cir. 1998). Such evidence exists here.

During a Family Support Team Meeting on August 14, 2002, members of the FST expressed their growing concern over Dominic's inexplicable injuries, safety, and general welfare. Dominic's guardian ad litem, a deputy juvenile officer, and Dominic's parents and their attorney, ultimately agreed that Dominic should be removed from the Dilley's care. Members of the FST further instructed Friend that the decision to remove Dominic was mandatory. After showing an initial reluctance

---

[2]The majority properly notes, and I re-emphasize, that James' claims against the Dilleys were settled before entry of summary judgment. The scope of the settlement agreement does not extend beyond the Dilleys.

to remove Dominic, Friend acquiesced and agreed that Dominic should be moved. Following the meeting, Friend, in conjunction with her supervisor, decided that Dominic would remain with the Dilleys. The record contains evidence that Friend's actions may have been motived, in some measure, by spite or vindictiveness. This fact, coupled with Friend's prior express agreement to remove Dominic based on safety considerations, provides sufficient circumstantial evidence that Friend actually drew the inference Dominic was in an environment that posed a substantial risk of serious harm.

Assuming there was a constitutional violation, there is little doubt Friend's conduct violated a clearly established right. Since 1993, we have recognized that children taken into state custody maintain a clearly established right to be kept in reasonable safety while in foster care. Burton v. Richmond, 370 F.3d 723, 730 (8th Cir. 2004) (citing Norfleet v. Ark. Dep't of Human Servs., 989 F.2d 289 (8th Cir. 1993)).

In cases involving deliberate indifference, the aggrieved party's constitutional claim often fails because the plaintiff fails to present evidence from which a jury could infer the official acted with the requisite mental state. James' constitutional claim against Friend presents no such problem, and genuine issues of material fact remain on the issue of Friend's deliberate indifference. Therefore, I respectfully dissent.

_____