# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2016

_____

Michael S. Dodd,

        Appellant,

v.

Steven C. Jones; Mike Thorn,

        Appellees.

\* \
\* \
\* \
\* \
\* Appeal from the United States \
\* District Court for the \
\* Western District of Missouri. \
\* \
\* \
\*

_____

Submitted: March 12, 2010 \
Filed: October 18, 2010

_____

Before BYE, COLLOTON, and GRUENDER, Circuit Judges.

_____

COLLOTON, Circuit Judge.

An intoxicated driver struck Michael Dodd, who had been lying injured on Route M in Lawrence County, Missouri, after his own apparent alcohol-related accident. Dodd brought an action under 42 U.S.C. § 1983 against Missouri State Highway Patrolman Steven Jones and Lawrence County Deputy Sheriff Mike Thorn in their individual and official capacities. He alleged that Jones and Thorn, both of whom responded to his accident, failed to protect him from the intoxicated driver, and

that Jones conducted an unlawful search of his blood. The district court[1] granted summary judgment for Jones and Thorn, and dismissed the claim against Jones in his official capacity. We affirm.

I.

Late on December 28, 2002, and into the early morning of December 29, Dodd was at the Route 66 Tavern in Lawrence County, Missouri. A witness reported that Dodd "had way more than enough to drink" and fell off a bar stool. Another witness stated that Dodd was "rowdy" and was "pretty drunk." Bar employees ejected Dodd approximately thirty minutes prior to closing time for breaking a beer mug.

Soon after Dodd departed, Micki Langley left the Route 66 Tavern with two passengers in her vehicle. While traveling south on Route M, she happened upon what appeared to be a single-car accident involving Dodd's pickup truck. Dodd's truck was partially in the ditch and partially blocking the southbound lane, nearly perpendicular to Route M. Kima Montgomery, one of Langley's passengers, noticed Dodd lying in the southbound lane, immediately north of the pickup.

After driving over debris from the accident, Langley stopped her vehicle south of Dodd's body in the northbound lane. Montgomery and fellow passenger Stanley Mason attended to Dodd, who was semi-conscious, and called 911. Langley turned her vehicle around and shined the headlights north toward Dodd. The passersby covered Dodd with a cloth from Langley's vehicle to keep him warm, and tried to assess the extent of Dodd's injuries while waiting for rescue personnel to arrive.

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

Jones and Thorn arrived in separate vehicles, within minutes of Montgomery's 911 call. They approached the scene from the south and parked their vehicles behind Langley's with headlights on and emergency lights flashing.

The officers feared that Dodd might have suffered a spinal injury, so they did not move him from Route M. Jones asked Mason to hold Dodd's head steady. At some point, Jones directed Langley to move her vehicle to a private drive east of Route M to provide space for an ambulance. During this time, Jones also began investigating Dodd's accident. He attempted to read Dodd's blood-alcohol content on a portable breath testing device. Montgomery noticed Jones "writing down a lot of things," including the license plate number of Dodd's pickup. Jones also searched Dodd's wallet for identification.

Meanwhile, Thorn attempted to contact the ambulance crew to notify it that Dodd was seriously injured, but he was unable to call out on his handheld radio. Thorn returned to his vehicle to try other means of contacting the ambulance. He then returned to Dodd's side, and Montgomery observed him shining a flashlight to assist Jones's search for Dodd's identification.

Approximately six minutes after Jones and Thorn arrived, Thomas McSwain's southbound pickup truck approached the scene. Thorn warned Jones and the others about McSwain's oncoming truck, and Jones waved his arms and his flashlight to warn McSwain of the accident scene. But McSwain, whose blood-alcohol content later tested at 0.164 percent, did not stop. McSwain's pickup struck Dodd, pushing his body fourteen feet south of where he initially rested on Route M, and then hit Dodd's truck. Jones and Thorn, with weapons drawn, ordered McSwain to stop. McSwain ignored the order, shifted to reverse, and ran over Dodd a second time, stopping only when Jones knocked on the driver's side window. Jones arrested McSwain for careless and imprudent driving.

After McSwain struck Dodd, Jones ascertained that Dodd had suffered additional injuries but was still alive. While waiting for the ambulance, Mason again tried to minimize Dodd's movements to avoid aggravation of his injuries. Jones asked the ambulance crew to expedite its arrival and requested a rescue helicopter. At this point, Jones again used the preliminary breath testing device to read Dodd's blood-alcohol content. Dodd was unresponsive due to his injuries, so Jones placed the device close to Dodd's lips and tested his normal exhalation. According to Jones, that process provided "plenty of air to get a reading" well above 0.08 percent.

As a result, Jones placed Dodd under arrest for driving while intoxicated. He read Dodd Missouri's Implied Consent Law, which provides that upon arrest for driving while intoxicated, a person "shall be deemed to have given consent to . . . a chemical test or tests of the person's breath, blood, saliva or urine for the purpose of determining the alcohol or drug content of the person's blood." Mo. Rev. Stat. § 577.020.1. Dodd did not respond. Jones asked paramedic Jay Fry to obtain a blood sample from Dodd to test for intoxicating substances. Fry complied, and Jones took possession of the blood sample. Dodd received treatment at a nearby hospital for critical injuries. Jones inexplicably left Dodd's blood sample in his home refrigerator for several weeks, and the sample was not tested until approximately one month after it was obtained.

Dodd sued Jones and Thorn under 42 U.S.C. § 1983 in their individual and official capacities. He alleged that the officers failed to protect him from McSwain, because they did not park their vehicles or set road flares north of the accident, where McSwain later approached Dodd's body. Dodd asserted that in failing to take such measures, Jones and Thorn violated policies of the Missouri State Highway Patrol and Lawrence County. Dodd also alleged that the act of analyzing his blood one month after his arrest violated the Fourth Amendment, and that Jones violated the Health Insurance Portability and Accountability Act (HIPAA), *see* 42 U.S.C. § 1320d-1 to -9, by taking custody of Dodd's blood without express consent.

-4-

The district court granted the officers' motions for summary judgment. As to the individual capacity claims, the district court determined that Dodd failed to establish a violation of a constitutional or statutory right. The court also ruled that Dodd failed to show the existence of an unconstitutional policy or a pattern of misconduct, as necessary for the claim against Thorn in his official capacity. Finally, the court dismissed the official capacity claim against Jones based on sovereign immunity.

## II.

We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to Dodd and drawing all reasonable inferences in his favor. *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). Because the law enforcement officers are entitled to assert a defense of qualified immunity in this § 1983 action, Dodd must show both that the facts construed most favorably to him establish a violation of a constitutional or statutory right, and that the right was clearly established at the time of the incident, such that a reasonable official would have known his actions were unlawful. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court recently held that federal courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

## A.

We first consider Dodd's claim that Jones and Thorn violated his rights under the Due Process Clause by failing to protect him from McSwain. The Due Process Clause generally does not provide a cause of action against state officials for harm caused by private actors. When a State takes a person into custody and holds him against his will, however, the Constitution imposes upon the State a corresponding

duty "to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). A similar responsibility may arise if the State, against a person's will, places him in a position of danger that would not have existed without the State's intervention. *James ex rel. James v. Friend*, 458 F.3d 726, 730 (8th Cir. 2006). Even in these situations, the state officials are liable, on a theory of substantive due process, only if their actions are so egregious or outrageous as to "shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see James*, 458 F.3d at 730. If actual deliberation is practical, then a showing of deliberate indifference is required; otherwise, a purpose to cause harm may be necessary to trigger liability. *Lewis*, 523 U.S. at 850-51.

We doubt whether the evidence supports a finding that Jones and Thorn took Dodd into custody and held him against his will so as to trigger the corresponding duty described in *DeShaney*. When the officers encountered Dodd, he was incapacitated and lying on the roadway. There is no showing that Dodd could have removed himself from the roadway, or that a passersby would have moved him out of the path later taken by McSwain, if Jones and Thorn had not arrived on the scene. Langley and her companions had covered Dodd to keep him warm and summoned assistance, but gave no indication of a desire to move his body while awaiting emergency medical personnel. Jones purported to place Dodd "under arrest" only after the intoxicated driver struck Dodd. The absence of a clearly established constitutional duty for the officers to act to protect Dodd under these circumstances is sufficient grounds to affirm the district court's grant of summary judgment in a qualified immunity case. *See Jackson v. Schultz*, 429 F.3d 586, 590-91 (6th Cir. 2005); *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1176-77 (7th Cir. 1997); *Harris v. District of Columbia*, 932 F.2d 10, 14-15 (D.C. Cir. 1991).

Dodd contends alternatively that a constitutional duty of care arose because some actions by Jones and Thorn placed him in a worse position than what prevailed

-6-

before they arrived, and that he was thus subjected to a "state-created danger." *See James*, 458 F.3d at 730. He argues that the emergency lights placed by the officers in the northbound lane might have distracted McSwain and prevented him from noticing Dodd in the southbound lane. He also asserts that Jones put him in a more perilous position by having Langley move her vehicle, because Langley had shone her vehicle's headlights in Dodd's direction. We think the possibility that the rescue efforts by Jones and Thorn made Dodd worse off is too speculative to trigger any constitutional duty of care. McSwain was an intoxicated driver who first ignored emergency lights, a flashlight, and waving arms warning him of the accident scene, and then disregarded the order of armed law enforcement officers to halt before he ran his vehicle over Dodd a second time. There is little, if any, reason to believe that the risks to Dodd were greater than if the officers had retained the *status quo* upon their arrival.

Even assuming, moreover, that a constitutional duty of care arose, the evidence does not support a finding that the conduct of Jones and Thorn was so outrageous as to shock the contemporary conscience. The officers plainly did not act with a purpose to harm Dodd. It is questionable whether actual deliberation was practical in this situation, where Jones and Thorn did not have time to make "unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Lewis*, 523 U.S. at 853. But accepting for purposes of analysis that deliberate indifference to Dodd's well-being could have given rise to constitutional liability, the evidence does not support such a finding.

Rather than ignore Dodd's predicament, the officers took affirmative steps designed to protect his health and safety. They parked their vehicles with headlights on and emergency lights flashing to alert oncoming traffic to a hazardous situation. Jones asked passerby Mason to hold Dodd's head still to protect against injury, and directed Langley to move her vehicle to make space for an ambulance. Thorn attempted to relay information about Dodd's condition to emergency personnel.

When McSwain approached the scene, Jones attempted to alert him of the accident scene with his flashlight and waving arms. That placement of a barrier or flares on the road might have been more effective in protecting Dodd does not establish that the officers were deliberately indifferent to Dodd's well-being. "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," *id.* at 849, and the Constitution imposes no obligation on the State to provide perfect or even competent rescue services. *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 478 (3d Cir. 2003).

B.

Dodd's next contention is that Jones violated his rights to be free from unreasonable searches under the Fourth Amendment by causing his blood sample to be tested almost one month after it was taken. Dodd argues that any exigent circumstances that justified the taking of his blood dissipated before Jones arranged for the testing, and that chemical analysis conducted without a warrant was unreasonable.

Because the percentage of alcohol in the blood diminishes with time, an effort to secure evidence of blood-alcohol content by drawing blood from a suspect after his arrest is a reasonable search incident to arrest. *Schmerber v. California*, 384 U.S. 757, 770-71 (1966); *United States v. Eagle*, 498 F.3d 885, 892 (8th Cir. 2007). Dodd contends that *Schmerber* justifies only the taking of the blood, and not the subsequent testing. He posits that the drawing of the blood is a reasonable "seizure," but that the testing is a separate "search" that must be justified independently. He relies on *Walter v. United States*, 447 U.S. 649, 654 (1980) (plurality opinion), where a plurality of the Court concluded that the FBI's lawful possession of films did not give them authority to search the contents for evidence of obscenity, and on the holding of *United States v. Jacobsen*, 466 U.S. 109 (1984), that "[e]ven when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth

Amendment requires that they obtain a warrant before examining the contents of such a package." *Id*. at 114.

Jones is entitled to judgment on this claim, because the testing of Dodd's blood required no justification beyond that which was necessary to draw the blood on the night of the accident. *Schmerber* indicates that the taking and later analysis of the blood are "a single event for fourth amendment purposes," *United States v. Snyder*, 852 F.2d 471, 474 (9th Cir. 1988), and that "a 'search' is completed upon the drawing of the blood." *Johnson v. Quander*, 440 F.3d 489, 500 (D.C. Cir. 2006). The Court in *Schmerber* held that probable cause to believe an arrested driver was intoxicated, together with the likelihood that delay in taking blood from the driver would result in the loss of evidence as alcohol dissipated, justified not only the drawing of blood, but also the introduction of the subsequent "chemical analysis" into evidence. 384 U.S. at 766-67. Therefore, once Jones had sufficient grounds to draw blood from Dodd after he was arrested for driving while intoxicated, the subsequent testing of that blood had "no independent significance for fourth amendment purposes." *Snyder*, 852 F.2d at 474.

C.

Dodd asserts that Jones violated a "right of privacy" by obtaining the blood sample from paramedic Jay Fry without complying with HIPAA. He alleges that HIPAA superseded a Missouri statute that requires medical personnel "acting at the request and direction of [a] law enforcement officer" to "withdraw blood for the purpose of determining the alcohol content of the blood." Mo. Rev. Stat. § 577.029. We agree with the district court that this claim fails because HIPAA does not create a private right of action. *Adams v. Eureka Fire Prot. Dist.*, 352 F. App'x 137, 139 (8th Cir. 2009); *Acara v. Banks*, 470 F.3d 569, 571-72 (5th Cir. 2006).

III.

Finally, Dodd makes a conclusory assertion that "the district court's findings concerning official capacity . . . are inapposite and are error." We treat Dodd's claim against Jones in his official capacity as a claim against the Missouri State Highway Patrol. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). The Highway Patrol, as an "arm of the state of Missouri," is entitled to sovereign immunity. *See Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1086 n.8 (8th Cir. 2006). The district court thus correctly dismissed this claim. *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007).

Dodd's official capacity claim against Thorn amounts to a claim against Lawrence County. Because Dodd has not presented sufficient evidence that Thorn committed a constitutional violation, the claim for municipal liability necessarily fails as well. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

\*     \*     \*

The judgment of the district court is affirmed.

_____

-10-