GRUENDER, Circuit Judge,
concurring in part and dissenting in part.
I concur in the portions of the Court’s opinion affirming the grant of summary judgment with respect to the § 1983 claim against Carroll and the dismissal of the battery claims, and vacating and remanding with respect to the Minnesota Data Practices Act claim. However, I respectfully dissent from the portion of the Court’s opinion vacating the grant of summary judgment with respect to the § 1983 claim against the remaining officers and the remaining state-law claims. I would hold that, taking Johnson’s account of the *830 officers’ actions as true, the officers used reasonable force at each step of their graduated response to her repeated interference with their arrest of McClennon.
According to Johnson herself, Officer Schweiger had grabbed McClennon and was attempting to take him to the ground when Johnson jumped onto McClennon for the first time, “bear-hugging” him. While the Court repeatedly faults the officers for not pausing in the midst of their physical encounter with the arrestee to request that Johnson remove herself, a “reasonable officer on the scene,” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), might well conclude that such a verbal warning would be futile in light of Johnson’s manic action.[3] Moreover, a reasonable officer coping with Johnson’s intrusion into the arrest scene “in circumstances that [we]re tense, uncertain, and rapidly evolving,” id. at 397, 109 S.Ct. 1865, certainly could conclude that other bystanders might decide to follow suit if Johnson’s actions were not deterred quickly and convincingly.[4] It was, therefore, not unreasonable for the officers to employ some degree of force to remove Johnson from the midst of their struggle with McClennon.
The degree of force used to remove Johnson from McClennon the first time was not excessive. There is no evidence that Johnson was subjected to any type of force other than what would be necessary to disengage her bear-hug hold and separate her from the arrestee. To be sure, pulling Johnson away from McClennon with sufficient force that she went to the ground may seem “unnecessary in the peace of a judge’s chambers,” but it is not unreasonable in the context of a split-second judgment by a police officer on the scene. Id. at 396, 109 S.Ct. 1865 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)). This conclusion is supported by the fact that Johnson sustained no injury during that first removal. See Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir.2011) (“The degree of injury is certainly relevant insofar as it tends to show the amount and type of force used.”).
*831 When Johnson immediately “rushed back over,” as she described it, and bear-hugged McClennon again, the officers had little choice but to physically remove her for a second time. While Johnson asserts that she was pulled apart from McClennon and thrown down “very much” harder than the first time, her quick return to the fray would have demonstrated to a reasonable officer that the initial degree of force had not been sufficient to deter her, or potentially others, from interfering with McClennon’s arrest. As a result, it was reasonable for the officers to use increased force to separate her from the arrestee for the second time. See Darrah v. City of Oak Park, 255 F.3d 301, 304, 307 (6th Cir.2001) (holding, where the plaintiff twice grabbed the ankle of an officer attempting to arrest another, that a blow to the plaintiffs mouth necessitating stitches was a reasonable use of force after the officer’s “first attempt at shaking her loose was only temporarily effective”).
Unfortunately, the second physical removal of Johnson resulted in damage to the anterior cruciate ligament in her left knee. Nevertheless, “[t]he degree of injury should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted.” Chambers, 641 F.3d at 906. That rule is particularly applicable in this case because Johnson’s knee injury is not of a type that correlates well with the strength of the force applied.[5] Notably, Johnson did not describe any concomitant results that would correlate more closely with hitting the ground with excessive force, such as abrasions, contusions, or temporarily being unable to catch her breath. In a broader sense, she does not assert that she was struck, kicked, had her arm bent behind her back, or was subjected to any other type of force inconsistent with a simple attempt to end her physical interference with the arrestee. Instead, the record shows that the officers took only the physical action necessary to disengage her bear-hug hold and deposit her at a safe distance from McClennon, whom the officers were attempting to tase.[6] In *832 short, while Johnson’s injury was a traumatic and undeserved result, a reasonable degree of force needed to separate Johnson from the arrestee does not become unreasonable merely because her knee was twisted.
Finally, when Johnson proved the officers’ first two efforts futile by returning for the third time to blanket MeClennon with her body, it was reasonable for the officers to resort to a more potent level of force to remove her and deter further interference. Rather than wait for her or another bystander to interfere for a fourth time, it was reasonable for the officers to use mace to ensure compliance. See Reed v. City of St. Charles, 561 F.3d 788, 790-91 (8th Cir.2009) (affirming grant of summary judgment based on qualified immunity where officers sprayed mace in an arrestee’s face after his repeated refusal to cooperate with the officers).
Because the officers used only a reasonable amount of force each time Johnson physically interfered with the arrest of MeClennon, I would hold that Johnson fails to allege a violation of her constitutional right to be free from excessive force. The same analysis demonstrates that, under an objective inquiry, the officers’ actions were legally reasonable, entitling them to official immunity from Johnson’s remaining state-law claims as well. See State ex rel. Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571 (Minn.1994). Accordingly, I respectfully dissent from the portion of the Court’s opinion and judgment vacating the grant of summary judgment with respect to the § 1983 claim and the remaining state-law claims.

. The officers claim that they verbally instructed Johnson to remove herself, but we construe the facts in the light most favorable to Johnson in determining whether a constitutional right was violated. See Dodd v. Jones, 623 F.3d 563, 566 (8th Cir.2010).

. The Court attempts to minimize the tense and uncertain nature of the circumstances in which the officers acted, noting that descriptions of the bystanders are "conflicting” and that the number of bystanders may have increased only after the officers’ use of force against Johnson. Ante at 826. Even construing the record in the light most favorable to Johnson, however, those facts are sufficient to establish the potential for escalating crowd resistance when Johnson initially intervened. McClennon testified that just before Johnson first bear-hugged him, "there were lots of people” outside watching the incident and questioning the officers' actions. Officer Schweiger testified to the presence of "about eight” adults, Officer Carroll to "between six and eight guys,” and Officer Kipke to "people all over the place yelling and screaming,” all at the point in time when Schweiger attempted to take McClennon to the ground, just prior to Johnson’s initial interference.
Johnson presented no contrary evidence regarding the state of the crowd at the time of her initial interference. Although she stated at one point in her deposition that "[tjhere was no one outside then but me,” it was in response to a question about "the people outside involved in this incident, so we were talking about the three police officers and your son and your niece." Johnson’s answers in context refer to whether her own children and niece were outside, not to the crowd in general. Therefore, even construing the record in the light most favorable to Johnson, at minimum six people were observing the struggle with McClennon when Johnson intervened. A reasonable officer could conclude that those six or more people were no more sympathetic than Johnson was to the officers' attempt to subdue McClennon.

. This conclusion is confirmed by medical research. See, e.g., Chris J. Hass et al., Knee Biomechanics during Landings: Comparison of Pre- and Postpubescent Females, 37 Med. & Sci. Sports & Exercise 100, 104-105 (2005) (finding that an anterior cruciate ligament tear correlates with landing on one’s foot while having a stiff, straight leg, rather than with force); David Koon & Frank Bassett, Anterior Cruciate Ligament Rupture, 97 S. Med. J. 755 (2004) ("Most ACL tears occur by a low-energy, noncontact mechanism involving a sudden deceleration with a rotational maneuver, such as cutting.” (emphasis added)); Letha Y. Griffin et al., Noncontact Anterior Cruciate Ligament Injuries: Risk Factors and Prevention Strategies, 8 J. Am. Acad. Orthop. Surg. 141, 142 (2000) (reporting that seventy percent of ACL injuries result from activities such as awkward landings and decelerating while pivoting).

. The Court emphasizes that "Johnson posed at most a minimal safety threat to the officers and was not actively resisting arrest or attempting to flee.” Ante at 827. Presumably this is an attempt to invoke the list in Graham of circumstances relevant to the reasonableness of the force applied. See 490 U.S. at 396, 109 S.Ct. 1865 ("[P]roper application [of the reasonableness test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.”). However, Graham cites those particular circumstances as illustrative examples, not an exhaustive list. Here, Johnson certainly was “actively resisting arrest,” albeit not her own, and continued to do so three times despite the officers’ graduated efforts to gain control of the situation. Although actively resisting another's arrest was not specifically listed in Graham, this appears to be precisely the sort of circumstance that Graham envisioned as justifying the use of a greater level of force.