# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3194

_____

Carol L. Hutson, mother of decedent, on behalf of her son and individually on her own behalf; Jason L. Hutson, father of decedent, on behalf of his son, and individually on his own behalf

*Plaintiffs- Appellants*

v.

Jude E. Walker; Julie Baumgardner; Sallie West; John Doe; Jane Doe

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: April 18, 2012
Filed: August 20, 2012

_____

Before RILEY, Chief Judge, MURPHY and MELLOY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Carol (Lynn) and Jason Hutson brought this action against Jude Walker, Julie Baumgardner, and Sallie West, social service employees in Jackson County, Missouri, alleging they violated 42 U.S.C. § 1983 and state law by recommending that custody of their son A.H. be granted to his grandparents, Carolyn and Patrick

Cattin. According to the Hutsons this recommendation resulted in the untimely death of A.H. The district court[1] granted summary judgment to the state employees after concluding that they were entitled to qualified immunity on the federal claims and official immunity on the state claims, and the Hutsons appeal. We affirm.

I.

Lynn and Jason Hutson were the biological parents of A.H. and his sisters, H.H. and D.H. Beginning in 2001 the Division of Family Services (DFS)[2] in Jackson County, Missouri received calls alleging that the children were not getting medical care and were not being properly supervised by their parents. There were also allegations that Jason had physically abused H.H. and thrown A.H. down a hall and that Lynn had burned A.H. and H.H.

Lynn separated from Jason in 2002 "due to some domestic issues." She contacted her mother, Carolyn Cattin, and asked to stay at her house with the children. Before Lynn and her children were ready to leave their own home, Carolyn arrived there with a DFS employee and a police officer. She informed Lynn that only the children were welcome at the Cattin home because Lynn did not get along with Carolyn's husband, Patrick Cattin. At that time Lynn agreed to leave her children with the Cattins. When she returned to check on them approximately two days later, Lynn was shown a handwritten note on DFS letterhead saying that the agency had received "a report of concern" and that she was to "leave all 3 children at [Carolyn's]" until a safety plan had been made.

---

[1]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

[2] DFS was a division in the Missouri Department of Social Services. At some point its name was changed to the Children's Division.

A juvenile officer filed a request for protective custody for A.H. in July 2002. The Family Court Division in the circuit court of Jackson County found probable cause to believe that A.H. was "without proper care, custody and support" and that continued placement with his parents would be "contrary to the welfare of the child and community." A.H. was thereafter placed "[i]n Division of Family Services [] Supervision [under the] care and custody of Carolyn and Patrick," and DFS was ordered to recommend a long term placement for A.H. and his siblings.

The case was referred to a DFS social worker named Jude Walker in July 2002 for his consideration of whether to recommend that the children be placed with the Cattins. Walker had started working at DFS in 2001. His first position at the agency focused on the placement of children in licensed foster homes, but in the summer of 2002 he became a "relative care worker" at the agency. In that position he was responsible for recommending whether a child should be placed in a relative's home. Walker has testified that relative care workers are required to make sure "the home was safe for kids to stay in" and that "the relatives were adequate to take care of kids."

As a relative care worker, Walker was initially assigned 10 to 12 ongoing cases from his predecessor. According to Walker, "the Hutson case was the newest [one] that [he] got." The Hutson children were already residing with the Cattins when he received the case and he was "instructed to expedite" his recommendation "so that [the] kids would be in guardianship with their grandparents." His supervisor was Julie Baumgardner; Sallie West was also involved. (Walker has described West as "basically kind of a supervisor.") Walker testified that West started the process of opening a file for the Hutson case and that his supervisor was generally "very involved with the whole process from start to finish."

Walker received training at DFS which he described as "basically . . . about [the] job and what was expected." The record does not detail specifics about his training or whether he received additional training when he started working as a

-3-

relative care worker. He testified that he was aware of the obligations imposed in a 1994 consent decree issued by the federal district court to protect children "from harm while in the custody of Missouri's Division of Family Services." See G.L. v. Stangler, 873 F. Supp. 252, 254 (W.D. Mo. 1994). Section II(D)(1) of the decree states that DFS "shall develop and utilize a placement practice guide setting forth policies and procedures to guide social workers' decisions related to placement. DFS shall adhere to the policies and procedures set forth in the placement practice guide." Id. at 257.

Walker was also aware that social workers were required to initiate a "home study" within 30 days of learning that a friend or family member was willing to provide care and custody to a child. That study would be provided to the family court before a guardianship recommendation was made and was to include background information on the applicant as well as character references. Employees were given a home study outline with questions to ask a potential guardian. They also were given a "Relative and Kinship Home Studies Checklist," which required the social worker to complete a CA/N check (a check of criminal and child abuse/neglect records) on all household members and a police check on all adults living in the potential guardian's home.

CA/N checks are defined in a Missouri state regulation as "the gathering of facts and records concerning . . . relative care providers which may include, but [need] not necessarily be limited to: a review of various automated systems . . . as appropriate; and a review of all records, court documents, testimony, child abuse records, as appropriate and all other information relating to any harmful act(s), or alleged harmful act(s) by an applicant . . . ." Mo. Code Regs. tit. 13, § 40-59.020. Another regulation states that social workers at DFS must "conduct background screening and investigation" and references the CA/N check. Mo. Code Regs. tit. 13, § 40-59.030.

Walker has testified that he understood a CA/N check to involve "putting the name of the family in [a] computer system and seeing if they had any record in the

-4-

system." He stated that the system would reveal "who the case is about, whoever was involved in the case, every family member in the home at the time of that allegation or that hot-line." He also explained that it "would tell you what was done, if services were provided to the family . . . . if the case is still open or closed. . . . [what] conclusions were met. . . . [and] if the cases were substantiated or unsubstantiated." It is unclear from the record whether Walker's supervisors trained him about where other documentation on a family might be available at the agency. Walker was unable to recall when testifying if agency policy required follow up with a family regarding an unsubstantiated allegation of abuse. He testified that it was his understanding that an unsubstantiated allegation could not be used against the family when making a guardianship recommendation.

Walker began the process of writing a home study for the Cattins after he was assigned the case in July 2002. Records from the agency indicate that Walker visited the Cattin home "once a month and was in regular contact" with Carolyn and with the Hutsons. Walker obtained information about the Cattins' marriage, finances, and child rearing practices. Walker testified that he spoke with Carolyn about her prior interactions with the agency, including a case that had been opened on her family in 1996. Carolyn explained to Walker that "the children were out of control at that time and they needed help to try to get them back on track." Walker also talked to A.H.'s mother, Lynn Hutson, who "repetitively explained to [Walker] that . . . Carolyn had not raised [her] brothers, she had abandoned them" and that Lynn had suffered "[m]ultiple situations of abuse." Walker also testified that he had requested previous agency records about Carolyn and Patrick but had never received them.

It appears that in November 2002 Walker started formalizing the home study on the Cattins for the family court. His study indicated that a CA/N check had been completed for Carolyn on December 6, 2002 and that "there was no history of probable cause finding." His summary of Carolyn's CA/N check stated that she had been involved with the agency in 1996 when her own children had been "out of control and needed residential treatment." Walker's study concluded that the case had

-5-

been closed when the children "ag[ed] out of the system." It also noted that a criminal check had been completed on Carolyn and Patrick on December 4, 2002 which revealed "no criminal history." Walker testified that he also completed a CA/N check for Patrick. There was no notation of that check in the home study, but Walker explained that may have been because it had "not pull[ed] up anything." His home study also included statements from references for the Cattins. They had informed Walker in December 2002 that Carolyn "is a very responsible person" and that the "children are always happy [and] . . . safe with the Cattins."

Walker signed the completed home study on December 8, 2002, and Sallie West signed it on December 6, 2002 on the line for a supervisor's signature. The study concluded that "Mr. [a]nd Mrs. Cattin love their grandchildren. They want the children to grow in a peaceful environment where they can be loved and cared for." It recommended granting guardianship of A.H., H.H., and D.H. to the Cattins.

The family court took the guardianship determination under advisement in November 2002 and then held a hearing on it. Lynn testified at the hearing that her mother Carolyn had a history of abusing her own children. The court also reviewed the home study. The court issued a written order in January 2003 finding that Lynn and Jason Hutson had provided an unsafe and unsanitary home, had a history of domestic violence, and had failed to provide the children adequate medical treatment. It concluded that the Hutsons lacked adequate housing and employment to care for the children and awarded guardianship of A.H. and his siblings to Carolyn and Patrick. The court released its jurisdiction over A.H. in April 2003 since he was "no longer in need of [its] services."

The Hutsons suggest that Walker did not complete the required investigation and CA/N checks because his home study did not include information about all of the Cattins' past interactions with the agency. There is evidence, for example, that DFS had received a call in March 1998 alleging that the Cattins had choked, slapped, and paddled their own children. There also is a record of an April 1998 incident in

which one of Carolyn's children was hospitalized and then placed in protective custody after she had refused to pick him up. The record also references a probable cause finding against Carolyn, but states that it was overturned in 1999 after an appeal. There is also evidence of an April 1998 report prepared by a DFS social worker as well as two 1998 psychological evaluations indicating that Carolyn's children had accused her of physical abuse. The April report stated that the Cattins need "to accept responsibility for their role in the family's dysfunction and the alleged abuse for progress to be made." An employee of the agency also testified in this case that she was "very shocked and stunned that anyone would consider" placing the Hutson children with the Cattins given Carolyn's past record of abuse.

A letter given to Walker after A.H.'s death by a program administrator at the agency suggested that Walker had only obtained information from Carolyn when writing the home study. The letter reminded Walker that social workers were required "to review all prior agency history involving the family" when making guardianship recommendations and noted that "numerous hotlines and two psychological evaluations . . . should have raised concerns about the safety of the Hutson children." The letter stated that Walker's "infractions" could not "be repeated in future actions." The letter did not state that Walker had failed to follow any specific instruction from a supervisor on the Hutson case, but it indicated that the program administrator wanted him to do a more thorough job on future cases.

The record in this case does not include a physical copy of the CA/N checks for either Carolyn or Patrick Cattin, but Walker testified that it would have been possible to print them out. Without any copy of the CA/N checks it is not possible to determine whether they would have included the specific information cited by the Hutsons or the agency. Counsel for the Hutsons represented at oral argument that he believed that physical copies of Walker's CA/N checks had been sought in discovery but that he was unable to make that representation "with total confidence."

There is no evidence that Walker or his supervisors remained involved with the family after the Cattins were awarded guardianship of the children and the court released its jurisdiction. Records show, however, that the agency received calls alleging that Carolyn had hit A.H. and H.H. and threatened Patrick with a gun. The last reported call regarding the Hutson children was in March 2005. There was apparently no further contact between the agency and the family until after the death of seven year old A.H. the following year on June 20, 2006. His older sister testified in this case that on the day of his death, she saw Carolyn physically abuse A.H. and heard her yell for someone to call the police after the boy became unresponsive. Lynn testified that when she saw A.H. at the funeral home, she observed severe bruising all over his body. The record indicates that Carolyn committed suicide approximately one week afer A.H.'s death.

The Hutsons claim in this action that Walker, Baumgardner, and West are liable for violation of A.H.'s substantive due process rights under 42 U.S.C. § 1983 and for wrongful death under Missouri law. They contend that Walker and his supervisors failed to complete the required CA/N checks and background investigation on Carolyn and Patrick Cattin before making a guardianship recommendation. The district court granted summary judgment to the state employees. It concluded that they were entitled to qualified immunity on the § 1983 claims because their conduct had not been conscience shocking. It also concluded that the employees were entitled to official immunity on the state claims because they had completed their ministerial obligations by recommending placement of the Hutson children with the Cattins. The Hutsons appeal.

II.

A grant of summary judgment based on qualified or official immunity is reviewed de novo, considering the evidence in the light most favorable to the Hutsons and making all reasonable inferences in their favor. See McLean v. Gordon, 548 F.3d 613, 616 (8th Cir. 2008). Summary judgment is appropriate where there are no

genuine issues as to any material fact and the movant is entitled to judgment as a matter of law. Id.

The district court granted qualified immunity to state employees Walker, Baumgardner, and West on the Hutsons' § 1983 substantive due process claims after concluding that the social workers had not engaged in behavior that was so egregious, outrageous, brutal, or offensive "that it does not comport with traditional ideas of fair play and decency." Whether an official is entitled to qualified immunity requires an examination of whether his or her conduct violated a constitutional right and whether that right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001). Those questions may be considered in either order. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The Hutsons contend that Walker, Baumgardner, and West violated A.H's substantive due process rights by failing to protect him from harm. Assuming the state had a duty to protect A.H. from harm after the family court exercised jurisdiction over him and ordered that a home study be completed, cf. Burton v. Richmond, 370 F.3d 723, 727–29 (8th Cir. 2004), a genuine issue of material fact must exist that the state employees violated a fundamental constitutional right and that the conduct shocked the "contemporary conscience." Flowers v. City of Minneapolis, 478 F.3d 869, 873 (8th Cir. 2007) (citations omitted). Conscience shocking behavior is "egregious" or "outrageous," Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847–48 n.8 (1998), and more than mere negligence. Avalos v. City of Glenwood, 382 F.3d 792, 799 (8th Cir. 2004). If an official has time for deliberation, his conduct will only shock the conscience if he acted with deliberate indifference. James ex rel. James v. Friend, 458 F.3d 726, 730 (8th Cir. 2006). An official is deliberately indifferent if he or she had knowledge of "facts from which an inference could be drawn that a substantial risk of serious harm existed" and then actually drew that inference. Id.

Walker's home study for the Cattins was the first one he had prepared as a relative care worker at the agency. The Hutsons were experiencing financial and

domestic problems at the time Walker recommended that the Cattins be granted guardianship of A.H. Before completing his home study, Walker spoke with the Cattins and received positive feedback from references. Walker indicated in his home study that a CA/N check had been completed for Carolyn. The study referred to a 1996 incident when Carolyn's own son had been placed outside her home. Walker spoke with Carolyn about the incident and was satisfied with her explanation. The record does not show that Walker was instructed to do additional investigation of Carolyn by his supervisors. Although there was no notation indicating that a CA/N check had been performed for Patrick, Walker testified that he had completed one but he may not have referenced it in his home study because the check had "not pull[ed] up anything." The home study did note that a criminal check had been completed on Carolyn and Patrick and had revealed "no criminal history."

Since no copies of the CA/N checks for Carolyn or Patrick were provided in the record, it is not possible to know what they would have revealed. The Hutsons argue that Walker's home study should have referenced a call to DFS alleging that Carolyn had abused her own children, a 1998 placement of one of Carolyn's sons in protective custody, and psychological evaluations indicating that Carolyn's children had accused her of physical abuse. Without a fuller record we cannot know if information about these incidents would have been readily available to Walker when he was preparing his home study. Taking the evidence in the light most favorable to the Hutsons, no evidence suggests that Walker could have inferred that Carolyn had physically abused A.H., see McLean, 548 F.3d at 616, or that A.H. was in potential danger when he made his guardianship recommendation. See James, 458 F.3d at 730. While Walker may have been "insufficiently skeptical" about Carolyn given her previous interaction with the agency and Lynn's calls alleging past abuse, his willingness to accept Carolyn's explanations does not rise to a substantive due process violation. Id. at 731. We conclude that Walker is entitled to qualified immunity.

Baumgardner and West were also involved in the process of recommending A.H.'s placement, but no evidence shows that any conduct or omission by them

shocked the conscience. West signed the home study that was ultimately given to the family court and Walker testified that his supervisor generally was "very involved" in the process. Although Walker's supervisors may have been negligent in training him or overseeing his recommendation about A.H.'s placement to the family court, negligence is insufficient to show conscience shocking behavior by Baumgardner or West. The record does not show that the supervisors could have inferred that A.H. was in actual danger. The facts alleged, taken in the light most favorable to the Hutsons, do not show that the action or inaction of the state employees shocked the conscience.

The record before the court does not make out any substantive due process violation. The district court therefore did not err in granting qualified immunity to Walker, Baumgardner, and West on the Hutsons' § 1983 claims.

III.

The Hutsons also brought claims against Walker, Baumgardner, and West for wrongful death, alleging that the state employees failed to perform an appropriate background check on Carolyn Cattin and that their inactions directly and proximately caused A.H.'s death. The district court granted summary judgment on the Hutsons' wrongful death claim, concluding that the state employees were entitled to official immunity.

Missouri state law provides official immunity to public officials acting within the scope of their authority "for injuries arising from their discretionary acts or omissions," but not for "torts committed when acting in a ministerial capacity." State ex rel. Hill v. Baldridge, 186 S.W.3d 258, 259 (Mo. 2006) (per curiam). Discretionary acts require "the exercise of reason in the adaption of means to an end, and discretion in determining how or whether an act should be done or a course pursued." Rustici v. Weidemeyer, 673 S.W.2d 762, 769 (Mo. 1984) (citation omitted). In contrast, ministerial acts are "of a clerical nature which a public officer

-11-

is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." Id. (citation omitted). Ministerial duties can arise from "either a statutory or departmentally-mandated duty." State ex. rel Twiehaus v. Adolf, 706 S.W.2d 443, 445 (Mo. 1986). Departmentally mandated duties "can arise from departmental rules, the orders of a superior, or the nature of the position for which the defendant was employed." Nguyen v. Grain Valley R-5 Sch. Dist., 353 S.W.3d 725, 730 (Mo. Ct. App. 2011).

In granting official immunity to the state employees, the district court concluded that no "issue of material fact exists as to whether defendants failed to perform a ministerial duty by violating a specific policy." The Hutsons argue that genuine issues of material fact remain about whether the state employees fulfilled their ministerial obligations of running CA/N checks on Carolyn and Patrick and actively investigating prior agency records on them before making a guardianship recommendation to the family court.

Whether the district court's grant of official immunity to Walker, Baumgardner, and West was appropriate depends on whether or not the consent decree, regulations, and agency policies created ministerial obligations. A social worker's handling of a child's care is generally "considered inherently discretionary." Porter v. Williams, 436 F.3d 917, 921 (8th Cir. 2006). In this case the consent decree obligates the agency to create policies and procedures for recommending placement for children, but it does not provide a mandatory directive to each employee as to how to implement the policies. See G.L., 873 F. Supp. at 257. An agency checklist requires that employees "actively investigate potential placements" and "[c]omplete [a] CA/N check on all household members," but it does not outline how a social worker must complete those obligations. The applicable regulation states that a CA/N check "may include . . . a review of various automated systems . . . and a review of all records, court documents, testimony, child abuse records, as appropriate . . . ." Mo. Code Regs. tit.13, § 40-59.020 (emphasis supplied). While the consent decree, regulations,

-12-

and agency policies require active investigation of potential placement and completion of a C/AN check, the manner in which those duties must be completed remains highly discretionary.

The Hutsons argue that the obligations in the consent decree, regulations, and agency policies are ministerial. They rely on Porter, 436 F.3d at 921–22, where we concluded that certain obligations incorporated in a consent decree were ministerial in nature. Those included requirements that a social worker visit a guardian's home a specific number of times and take certain actions if a child may have been abused. Id. The Porter requirements gave no discretion to the employee as to the actions required, unlike the obligations for the social worker in this case. See id. The obligations here are more like those in James, 458 F.3d at 731–32, where a DFS policy manual obligation to inform team members "of significant changes in status of the case" was discretionary. That was because team members had to exercise judgment regarding whether a change in status had occurred, whether it was significant, and whether there was urgent need for any notification. Id. The regulation and agency policies in this case are similarly discretionary. For example, the regulation states that a CA/N check "may include" review of certain materials and that certain files should be reviewed "as appropriate." The scope of such a described investigation is discretionary.

Official immunity is appropriate in this case if no genuine issue of material fact remains as to whether the ministerial obligations of investigating potential placements and running the C/AN check were completed. Walker testified that he had completed CA/N checks and criminal checks on both Carolyn and Patrick before submitting the home study to the family court. Walker's study noted that Carolyn had been involved with DFS in 1996 when one of her children was out of control and needed residential treatment. While a letter from the agency to Walker after A.H.'s death suggests that there may have been additional records relating to alleged abuse by Carolyn in 1998, no CA/N check has been made available in the record. There is no evidence that Walker's supervisors instructed him to take some specific action on the Hutson case

-13-

which he did not do. The Hutsons have not established which records on Carolyn and Patrick would have been readily available to Walker while he was completing the home study. They also have not shown that Walker was specifically trained on when additional investigation would be required on a family. Since there is no genuine issue of material fact in the record about whether Walker completed his ministerial obligations before recommending placement for A.H., he is entitled to official immunity.

There is also no genuine issue of material fact about whether supervisors Baumgardner and West failed to complete a ministerial obligation. The regulations and agency policies do not state that a supervisor "must" or "shall" take a specific action when overseeing a social worker's home study. The general supervision of Walker by Baumgardner and West "required the exercise of reason and professional judgment," both of which are inherently discretionary. Porter, 436 F.3d at 923. Since general supervision of employees "is discretionary," Nguyen, 353 S.W.3d at 733, Baumgardner and West are entitled to official immunity. See also Southers v. City of Farmington, 263 S.W.3d 603, 621 (Mo. 2008).

IV.

Accordingly, the judgment of the district court is affirmed.

_____

-14-